UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BP PRODUCTS NORTH AMERICA INC.,

                              Plaintiff,

-vs-                                              Case No.  6:06-cv-491-Orl-19DAB

OAKRIDGE AT WINEGARD, INC.,
MAHAMMAD QURESHI, PACIFIC
ENERGY, INC.,

                              Defendants.
_____

REPORT AND RECOMMENDATION

TO THE UNITED STATES DISTRICT COURT

        This cause came on for consideration with oral argument on the following motions[1] filed

herein:

| | |
|---|---|
| **MOTION:** | **BP'S MOTION TO ENFORCE OAKRIDGE AND QURESHI'S COMPLIANCE WITH SETTLEMENT AGREEMENT (Doc. No. 85)** |
| **FILED:** | **August 15, 2006** |
| | **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**. |

_____

[1] Since the filing of its motion to enforce the settlement agreement, Plaintiff has amended its complaint, not to seek enforcement of the settlement agreement, but to assert other claims against Oakridge and Qureshi.  It is unclear whether Plaintiff is abandoning its effort to seek enforcement of the alleged settlement.  Certainly, assertion of claims arising from the underlying contracts and relationships between the parties is legally and logically inconsistent with enforcement of Plaintiff's version of the settlement. *See Hustad v. Edwin K. Williams & Co.-East*, 321 So.2d 601, 602 (Fla. 4th DCA 1975) (when there is a material breach of a contract, the injured party must elect between mutually exclusive remedies of rescission and action for damages for total breach), *cert. denied*, 333 So.2d 41 (Fla. 1976); *see also Haisma v. Edgar*, 578 N.E.2d 163, 167 (Ill. 1st DCA 1991) (upon breach of a settlement agreement that amounts to a refusal to perform, other party may elect to regard agreement as rescinded and proceed on the original cause of action, or may sue on the agreement for the breach).  At the very least, Plaintiff should be required to clarify its position and elect what remedy it is seeking.

<table>
<tr><td><strong>MOTION:</strong></td><td><strong>PACIFIC ENERGY, INC.'S MOTION TO ENFORCE COMPLIANCE WITH SETTLEMENT AGREEMENT (Doc. No. 89)</strong></td></tr>
<tr><td><strong>FILED:</strong></td><td><strong>August 21, 2006</strong></td></tr>
</table>

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

The dispute in the instant case involves a contract for the sale of a fuel service station located at 601 West Oakridge Road in Orlando, Florida.  The Plaintiff, BP Products North America, Inc. ("BP"), instituted the instant lawsuit on April 11, 2006, and applied to the Court for a preliminary injunction to void the sale of the BP Premises, suspend operation of the BP Premises pending compliance with BP's right of first refusal and an accounting by Defendants.  *See* Doc. Nos. 2 & 7.

On June 26, 2006, Chief Judge Fawsett denied BP's Motion for Preliminary Injunctive Relief.  Doc. No. 67.  On the same day Judge Fawsett entered a denial of the Motion for Preliminary Injunctive Relief, the Defendants moved[2] to refer the case to mediation, which the Court granted on July 5, 2006, allowing the parties until July 22, 2006 to mediate the case with Joaquin Fraxedas.  Doc. No. 70.  The mediation of July 22, 2006 reached an impasse and the parties filed their Case Management Report.  *See* Doc. Nos. 78, 81.  On August 14, 2006, BP and Pacific Energy filed Notices of Settlement.  Doc. No. 83.

***Factual Background[3]***

Defendant Oakridge at Winegard, Inc., and its principal Mahammad Qureshi (collectively "Oakridge") operated a gas station and convenience store at the premises in question from 1996 until

---

[2]Plaintiff did not file opposition to the Motion to refer to mediation; however, Plaintiff later sought to extend the deadline for the mediation until August 31, 2006, which was denied.  *See* Doc. No. 73, 77.

[3]The Factual Background is adopted from Chief Judge Fawsett's Order denying BP's Motion for Preliminary Injunction.  Doc. No. 67.

November 2005. (*See, e.g.,* Doc. No. 3-1, 3-2).  It is undisputed that throughout this time period, Oakridge and BP were parties to an exclusive fuel supply  agreement to sell BP brand fuel.  *See, e.g.,* Doc. No. 2-2, 2-3, 2-4.  A rider to the fuel supply agreement provided the following:

> Right of First Refusal. (a) Should Dealer . . . at any time during the term of the Supply Agreement or any extension or renewal thereof, receive an offer to purchase the Premises, or . . . make an offer to sell the Premises, . . . Dealer shall submit to [BP] an accurate copy of the offer, including the name and  address of the proposed purchaser, the amount of the proposed purchase price, and all other terms and conditions of this offer, and [BP] will have forty-five (45) days from the date of receipt thereof in which to elect to purchase the premises which are the subject of the offer ("Right of First Refusal to Purchase").

Doc. No. 2-4 at 3.

By 2003, Oakridge had determined the station was not very profitable and hence sought to sell the premises and concentrate on other business ventures. *See, e.g.,* Doc. No. 56, Qureshi Depo. at 68, 70.  In August 2003, Mr. Qureshi met with a representative of BP, Chris Elliott, and asked if BP would be interested in purchasing the property. *Id*. at 70-71.  Oakridge has produced unrefuted evidence that Mr. Elliott responded that BP was not interested in purchasing the service station. *See, e.g., id.* at 71; Doc. No. 41-1 ¶¶ 6-7, 12.

Oakridge was unable to sell the premises for some time and began to lower its asking price. Doc. No. 41-1 ¶ 14.  Mr. Qureshi testified that in 2005 he met with BP's Retail Account Executive, Guy D'Amico, reiterated that the station was for sale, and asked BP for a second time if it had any interest in buying it. According to Mr. Qureshi, Mr. D'Amico stated that BP was not interested in purchasing the property. *See, e.g., id.* ¶¶ 11-13; Doc. No. 56, Qureshi Depo. at 79-80, 90.  Mr. D'Amico's testimony, however, conflicts with Mr. Qureshi's statements on this point. Mr. D'Amico testified that Mr. Qureshi only asked him to follow up on an earlier request by Mr. Qureshi to another BP employee to "work out some sort of a deal" regarding the premises. *See* Doc. No. 56, D'Amico

Dep. at 31.  According to Mr. D'Amico, he was never specifically asked whether BP would purchase the Oakridge station, and only once did Mr. Qureshi mention to him that he wanted to sell "all his locations."   According to Mr. D'Amico, during that conversation the Oakridge station was not specifically discussed. *See id.* at 11-12, 30.

Mr. Qureshi further testified that both in August 2003 and in the summer of 2005, when BP notified Oakridge for the second time that it was not interested in purchasing the service station, BP also stated that it was interested in terminating an exclusive fuel supply agreement between BP and Oakridge which was scheduled to last until 2011. *See, e.g.,* Doc. No. 56, Qureshi Depo. at 79-80, 90; Doc. No. 41-1 ¶¶ 7-12. In other words, according to Mr. Qureshi, BP expressed interest in having Oakridge de-brand the station in order to sell non-BP fuel. Oakridge has produced the proposed, unexecuted contract given to it by BP regarding termination of the fuel supply agreement, and Mr. Qureshi's testimony on this matter is not refuted. *See, e.g.,* Doc. No. 41-2; 41-3; Doc. No. 41-1 ¶¶ 7-12.  Furthermore, the testimony of Mr. D'Amico demonstrates that by 2005 BP had terminated all but two or three of its forty (40) fuel supply agreements with independently-owned BP fuel stations in central Florida. *See* Doc. No. 56, D'Amico Depo. at 12.

In November of 2005, Pacific Energy, Inc. and its principal, Arooj Ahmed, (collectively "Pacific"), contracted with Oakridge to purchase the premises in question.  *See, e.g.,* Doc. No. 41-1 ¶ 14.  Oakridge and Pacific discussed the exclusive fuel supply agreement as Pacific was interested in selling Citgo fuel at the gas station instead of BP fuel. Mr. Qureshi stated to Mr. Ahmed that it would cost approximately $100,000.00 to institute an early termination of the fuel supply agreement. *See, e.g.,* Doc. No. 56, Qureshi Depo. at 96-98.  This was the amount that might have to be paid back to BP and represented the amount of capital outlay BP provided initially to construct the station.

Accordingly, Oakridge reduced its purchase price by that amount in order to facilitate the sale, and Pacific began operating a Citgo fuel service station on the premises in question. *See, e.g.*, Doc. No. 56, Ahmed Depo. at 28-31. When BP learned of the sale and subsequent switch to Citgo fuel around March of 2006, it removed any remaining BP trademarks and trade identities from the premises. Doc. No. 3-1 at ¶ 17.

It is undisputed that at no time prior to the instant litigation did Oakridge forward to BP a copy of the contract with Pacific or orally notify BP of the pending sale. *See, e.g.*, Doc. No. 41-1 ¶ 14. Thus, BP never exercised a right to purchase the property pursuant to the contractual right of first refusal. BP sought a preliminary injunction voiding the sale of the premises, ordering compliance with the contractual right of first refusal, and suspending the operation of the service station until BP could determine whether or not to exercise its right to purchase the property, and an order directing Pacific to provide an accounting of all revenues since the purportedly unlawful sale. *See* Doc. No. 2-1 at 8-9. In response, Oakridge and Pacific argued that BP failed to establish any of the prerequisites of preliminary injunctive relief.

Chief Judge Fawsett denied preliminary injunctive relief, holding that BP had not met its burden of demonstrating that the issuance of a preliminary injunction was warranted in part because there was no evidence that BP had any intention to exercise its option to purchase the premises and may have waived its right of first refusal; there also was no evidence that Pacific intentionally and unjustifiably interfered with the right of first refusal. Doc. No. 67.

On Saturday, July 22, 2006, the parties participated in court-ordered mediation, but reached an impasse. Doc. No. 78. On July 25, 2006, BP placed $200,000 in escrow with Jerome Mitchell, Esq. of the Daytona Beach law firm of Riggio & Mitchell, P.A. in furtherance of the exercise of its right of first refusal to buy the service station located at 601 West Oakridge Road.

*Analysis*

The Court has jurisdiction to enforce a settlement agreement when one party refuses to abide by the agreement prior to dismissal of the action. *Kent v. Baker, III,* 815 F.2d 1395 (11th Cir. 1987) (district court has jurisdiction to enforce settlement agreement when a party refuses to comply with the agreement before the case has been dismissed); *Skrtich v. Thornton*, 2003 WL 24845555 (M.D. Fla. 2003) (Adams, J.) (quoting *Kent*).   In this case where material facts concerning the existence of an agreement to settle were in dispute, the Court properly held a hearing to obtain evidence on the factual matters in dispute on September 26, 2006. *See id.*

*Evidence presented at the hearing concerning settlement negotiations*

According to the testimony and evidence presented at the evidentiary hearing, Lee Schillinger, counsel for Oakridge and Qureshi at 11:25 p.m. on July 27, 2006 sent an email to counsel for BP and Pacific Energy asking to "renew our discussion we had on Saturday [July 22 at mediation] regarding payment of the note as opposed to purchase of the station.  I will contact Jay [the mediator] tomorrow AM."  Plaintiff's Ex. 1.

The following morning, on July 28, 2006, Oakridge's counsel, Lee Schillinger, spoke with BP's counsel, Mark Blumstein, about the possibility of settlement.  Blumstein[4] testified at the evidentiary hearing that Schillinger called him with a settlement proposal from Oakridge to pay to BP $263,616.95, which was the amount due for the unamortized advance of funds due under the Dealer Supply Agreement; Schillinger confirmed that the money would be coming from Oakridge and the $200,000 in escrow money would be returned to BP without penalty or deductions and Pacific Energy would retain ownership of the station, according to Blumstein.  Counsel for Pacific Energy, Kathryn

---

[4]Mr. Blumstien's testimony was consistent with his Declaration. *See* Doc. No. 86.

Weston[5] testified that Blumstein contacted her on July 28, 2006 to tell her of the settlement offer from Oakridge and to confirm that none of the settlement money would be coming from Pacific Energy.

On the afternoon of July 28, 2006, counsel for BP, Oakridge, and Pacific Energy engaged in further settlement discussions.  Blumstein prepared a letter memorializing the terms of the settlement in a letter dated July 28, 2006 which was sent to counsel for Oakridge and Pacific Energy through electronic mail at 5:34 p.m. on July 28, 2006.  The July 28 letter read in pertinent part:

This letter shall memorialize the material terms of the settlement reached today between the parties in the subject matter.  They are as follows:

1.   Within thirty (30) days of the date of this letter, Oakridge at Winegard, Inc. ("Oakridge") and/or Mahammad Qureshi ("Qureshi") shall [sic] a cashier's check for Two Hundred Sixty Three Thousand Six Hundred Sixteen and 95/100 Dollars ($263,616.95) ("Settlement Amount") payable to BP products North America Inc. ("BP").

2.  The monies currently held in escrow with Riggio & Mitchell, PA in the amount of Two Hundred Thousand and 00/100 Dollars ($200,000) ("Escrow Funds") shall be returned to BP via the undersigned.

3.   Oakridge, Qureshi, Pacific Energy, Inc. ("Pacific") and BP (collectively the "Parties") shall be responsible for their respective fees and costs.

4. The Parties shall enter into a Settlement Agreement and Release to be prepared by BP.  The Parties shall release each other from any and all claims pending in the subject matter, including those pertaining to 601 West Oakridge Road, Orange County, FL - the assets, improvements and/or business thereon.

5.  The Parties shall dismiss with prejudice all pending claims before the court in the subject matter following delivery of the Settlement Amount and return of the Escrow Funds to the undersigned, as well as the execution of the Settlement Agreement and Release.

6.  The Parties shall execute a Stipulation of Dismissal with Prejudice of the subject matter following execution of the Settlement Agreement and Release and payment and delivery of the Settlement Amount and Escrow Funds to the undersigned.

---

[5]Ms. Weston's testimony was consistent with her Declaration.  *See* Doc. No. 90.

Thank you all for your cooperation and prompt resolution of this matter.  I will circulate the Settlement Agreement and Release next week and notify the court that the parties have settled this dispute.

Pl. Ex. 2 (hereinafter the "Settlement Letter")[6].

Later on July 28, 2006 (at 10:27 p.m.), Weston sent an email to Blumstein, copying Schillinger, that said: "The letter reflects my understanding of our agreement.  It is implied but not explicitly stated in the agreement that Pacific Energy will retain title to the station, which is, I understand, part of our agreement."  Plaintiff's Ex. 3.  Still later (at 10:58 p.m.) on July 28, 2006, Schillinger wrote to Blumstein:  "The agreement must reference the termination of all obligations under the supply agreement and resignage agreement, acknowledging that all loans have been paid in full, and please return the original notes marked paid in full."  Pl. Ex. 4.  There was no mention of any other revisions to the terms spelled out in the Settlement Letter.

On August 4, Blumstein circulated a draft of the proposed settlement agreement and release incorporating the terms of the July 28 Settlement Letter.  Def. Ex. 2A.  On August 8, 2006, Weston circulated her revisions to Schillinger and Blumstein.  Def. Ex. 2.  Weston and Blumstein discussed their respective proposed changes on August 9, 2006.  On August 10, 2006, Blumstein emailed Schillinger and Weston with a redlined version of the proposed settlement agreement and suggested that all counsel talk in the afternoon "with an aim to go final, commence execution and bring this matter to a close."  Def. Ex. 7.

On August 11, 2006, Schillinger, Blumstein, and Weston participated in a telephone conference call to finalize the language of the Settlement Agreement.  Weston testified that during the conference call, Schillinger expressed for the first time that Oakridge would not be able to pay the monies required by the Settlement Letter within thirty days and he had assumed that Pacific Energy

---

[6]Exhibit references are to those exhibits presented at the hearing.

would be paying some portion of the monies due to BP.  The same day, on August 11, 2006,

Schillinger sent a letter to Blumstein and Weston which read in pertinent part:

> [Due to other litigation commitments,] I had not had a chance to review any of your proposed settlement agreements with my client until today.

> This will confirm my telephone conversation with you of this date.  Certain changes need to be included in the proposed settlement agreement.  First, as to Pacific Energy, the mutual release clause must state the obligation of Pacific Energy to reimburse the costs of cancellation of the BP Supply Agreement, up to $100,000 as set forth in the Commercial Contract sales agreement between those parties.  Secondly, please delete any reference to Denise Qureshi, who has had nothing to do with these transactions.

> Finally, as to payment of the $263,000, as I previously explained, we agree to payment of that sum, however, my client is in a position to pay only $63,000 on August 28, 2006.  He will pay the remaining $200,000 in 40 equal monthly payments of $5,000 each, commencing on October 1, 2006.  There will be no interest and no prepayment penalty.

> Once these changes are included in the proposed agreement, the settlement can be concluded.

Pl. Ex. 5.

Schillinger testified that Oakridge believed it was entitled to a refund of its standing deposit

towards gasoline delivery and unpaid rebates.  He also testified that Oakridge had not authorized him

to negotiate or release its rights to recover the rebates or refund from BP or to relieve Pacific Energy

of its contractual indemnification of the $100,000 termination fee.  Schillinger further testified that

in the conversation on the afternoon of July 28, 2006, BP offered to settle for payment of $263,616.95

to be paid within thirty days, but he advised that he would have to notify his client and that all terms

were subject to approval of the client.

Schillinger also testified that during the August 11 conference call discussion, he commented

that the proposed settlement agreement made no mention of Pacific Energy's prior commitment to

indemnify Oakridge for the $100,000 early termination fee.  On cross-examination at the Hearing,

Schillinger conceded that he believed the $63,000 up-front payment, and 40 subsequent monthly $5,000 payments (totaling $263,000) that Oakridge proposed, would come from Pacific Energy.

Mr. Qureshi testified at the hearing that he owns a "couple hundred gas stations," has been in business seventeen years, has had seven to eight lawsuits, he uses different litigation lawyers, and he does not read letters but leaves that to his assistants.  He testified that he never authorized Schillinger to settle on behalf of himself or Oakridge, but that he did give the general direction to get the case settled and he was motivated to settle because Pacific Energy had offered to buy other locations. Although Mr. Qureshi testified at the September 26 hearing about certain conversations with Schillinger in which he specifically recalled not giving Schillinger authority to settle, Qureshi did not remember those conversations when he was deposed about them by BP two weeks before, on September 14, 2006.

The Court does not find Mr. Qureshi to be credible that he had not given Schillinger authority to settle.

### *Existence of settlement agreement and enforcement of terms*

The public policy of the State of Florida highly favors settlement agreements among parties and will seek to enforce them whenever possible. *Sun Microsystems of California, Inc. v. Engineering and Mfg. Systems, C.A.,* 682 So.2d 219, 220 (Fla. 3rd DCA 1996) (citing *Robbie v. City of Miami*, 469 So.2d 1384 (Fla. 1985) and other cases).

Florida's Fourth District Court of Appeal summarized the criteria for determining whether the parties reached an enforceable settlement agreement:

> Settlement agreements are favored as a means to conserve judicial resources. Courts will enforce them when it is possible to do so.  They are interpreted and governed by the law of contracts. The party seeking to enforce a settlement agreement bears the burden of showing the opposing party assented to the terms of the agreement. To compel enforcement of a settlement agreement, its terms must be sufficiently specific

and mutually agreed upon as to every essential element. Uncertainty as to nonessential terms or small items will not preclude the enforcement of a settlement agreement. A client's express authority given to his attorney to settle a cause of action must be clear and unequivocal. However, [t]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs - not on the parties having meant the same thing but on their having said the same thing." A trial court's finding that there was a meeting of the minds must be supported by competent substantial evidence. When that evidence exists, this court will affirm. A review of this record reveals that it contains competent substantial evidence to support the trial court's determination that the parties entered into an enforceable settlement agreement. We therefore affirm the trial court's decision to enforce the settlement.

*Spiegel v. H. Allen Holmes, Inc.*, 834 So.2d 295, 297 (Fla. 4th DCA 2002) (internal citations omitted) (cited in *Skrtich,* 2003 WL 24845555 at *2). In addition, any order enforcing a settlement agreement must mirror the terms of the agreement. *Id.*

In this case, competent substantial evidence indicates that there was a meeting of the minds and that the parties entered into an enforceable settlement agreement. As clearly reflected by the circumstances, Schillinger, counsel for Oakridge and Qureshi, had authority to settle on their behalf. As in the Eleventh Circuit case of *Murchison v. Grand Cypress Hotel Corp.,* 13 F.3d 1483, 1486 (11th Cir. 1994), the court considered the client's discussions with his attorney during settlement negotiations, the client's knowledge that his lawyer was in the process of negotiating a settlement, the client's meeting with his attorney to discuss progress of the negotiations, and his presence in the courtroom when the settlement was announced on the record, as indicating his attorney clearly had authority to engage in settlement negotiations. 13 F.3d at 1485-1486. The Eleventh Circuit also noted pointedly that the client was "an educated man who understood the terms of the settlement agreement." 13 F.3d at 1486.

In this case, Mr. Qureshi is a sophisticated owner of a "couple hundred gas stations" who has been in business seventeen years, and participated in seven to eight other lawsuits represented by counsel. Schillinger and his client, Qureshi (acting on behalf of Oakridge) participated in mediation

on July 22, where the issue of the unamortized amount from the dealer supply agreement was on the table.  He was motivated to settle the case because  Pacific Energy had offered to buy other locations and Qureshi initiated the reopening negotiations immediately after he returned from vacation five days later, on July 27, and indeed set forth most of the terms of the offer.  Schillinger testified that Qureshi had authorized him to offer payment of $263,000 to BP.  Although Schillinger also testified that he was not authorized to make an offer regarding the length of time of the repayment, the Court does not find this portion of his testimony to be credible.  Schillinger admits to discussing with Blumstein on the morning of July 28 (without Weston) that a fifteen-day repayment period was too short.  Schillinger also did not raise any objection to the time period in his email response (Pl. Ex. 4) to the Settlement Letter which specifically spelled out a thirty-day period for repayment as the first words of the first term in the Letter (Pl. Ex. 2).

There was a meeting of the minds during the conference call on the afternoon of July 28 and the parties came to terms without reserving authority.  Blumstein memorialized the oral settlement agreement in the July 28 Settlement Letter which he emailed to Weston and Schillinger at 5:34 p.m. that day.  In response, Schillinger's email, sent at 10:58 p.m. merely stated:  "The agreement must reference the termination of all obligations under the supply agreement and resignage agreement, acknowledging that all loans have been paid in full," without reference to any other revisions to the terms spelled out in the Settlement Letter.  *See* Pl. Ex. 4.  Schillinger admitted that he did not qualify the settlement terms during the three-way conference call on July 28 by stating the settlement was "subject to his client's approval."

The existence of a settlement is also confirmed by Schillinger's comments to Jerome Mitchell, who testified that Schillinger told him that the parties had settled the matter.  Schillinger admitted on

cross-examination that he told Mitchell the parties had settled, but directed Mitchell to hold the escrowed funds until he received the signed settlement documents.

The Eleventh Circuit's pithy comments in *Murchison* are equally appropriate here:

"This case presents a not unfamiliar situation in which the relief appellant apparently wanted and the relief he asked for were not the same." *Dankese,* 693 F.2d at 15-16. We favor and encourage settlements in order to conserve judicial resources. We cannot allow a litigant to attack the integrity of the settlement process by attempting to recharacterize the focus of his litigation after he decides he is unhappy with the settlement.

*Murchison v. Grand Cypress Hotel Corp.,* 13 F.3d 1483, 1487 (11th Cir. 1994).

Based on the circumstances evinced at the hearing on the matter, the terms of the July 28 Settlement Letter memorialize the terms of the oral settlement reached by all parties during the conference call on the afternoon of July 28, 2006.

The best way to effectuate the terms of the oral settlement is to enter judgment in favor of BP and against Qureshi and Oakridge beginning August 27, 2006 for $263,616.95 due plus a per diem[7] amount of $65.00, allow Pacific Energy to remain in possession of the property, and dismiss with prejudice all pending claims in the litigation[8], awarding no fees or costs[9].

---

[7]For 2006 the statutory interest rate in Florida is 9% per year.  *See* § 55.03, Florida Statutes and http://www.fldfs.com/aadir/interest.htm

[8]The pending **motions to dismiss (Doc. Nos. 34 and 51)** should be dismissed as moot.

[9]The parties did not provide for the award of fees and costs in the enforcement of the Settlement Agreement.  *Cf. Spiegel v. H. Allen Holmes, Inc.*, 834 So.2d 295, 297 (parties entitled to fees for enforcement of settlement agreement where such language was included in agreement).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on October 20, 2006.

_David A. Baker_
_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy