**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**BP PRODUCTS NORTH AMERICA,**
**INC., a Maryland Corporation,**

              **Plaintiff,**

**-vs.-**                             **Case No.:  6:06-cv-491-Orl-19DAB**

**OAKRIDGE AT WINEGARD, INC.,**
**a Florida Corporation, MAHAMMAD**
**QURESHI, and PACIFIC ENERGY,**
**INC., a Florida Corporation,**

              **Defendants.**
_____

**ORDER**

This Case comes before the Court on the following:

1.      Report and Recommendation [to Grant Motion to Enforce Compliance with Settlement Agreement], signed by Judge David A. Baker on October 20, 2006; (Doc. No. 123);

2.      Objections to Magistrate's Report and Recommendation and Incorporated Memorandum of Law, filed by Defendants Oakridge at Winegard, Inc. and Mahammad Qureshi on November 3, 2006; (Doc. No. 131);

3.      Request for Oral Argument, filed Defendants Oakridge at Winegard, Inc., and Mahammad Qureshi on November 3, 2006; (Doc. No. 132);

4.      BP's Response to Objection to Magistrate's Reports and Recommendation, filed by Plaintiff BP Products North America, Inc. on November 17, 2006;

(Doc. No. 135); and

5.      Response to Objection to Magistrate's Report and Recommendation, filed by

Defendant Pacific Energy, Inc. on November 20, 2006.  (Doc. No. 136).

**Background**

The dispute in the instant case involves a contract for the sale of a fuel service station located at 601 West Oakridge Road in Orlando, Florida.  The Plaintiff, BP Products North America, Inc. ("BP"), instituted the instant lawsuit on April 11, 2006, seeking a judgment voiding the sale of the above-referenced station and suspending the operation of business at the site until certain conditions are met.  (*See* Doc. No. 1, pp.1-2).  Defendants Oakridge at Winegard, Inc., and its principal Mahammad Qureshi (collectively "Oakridge"), filed a counterclaim against BP, arguing that BP charged Oakridge unequal prices for fuel amounting to a violation of the Robinson-Patman Act and unfair competition under Florida law.  (*See* Doc. No. 38, filed on May 24, 2006, at pp. 10-11).  Oakridge also filed a cross claim against Defendant Pacific Energy, Inc. ("Pacific"), alleging that Pacific failed to properly notify BP and failed to properly terminate the fuel supply agreement with BP as it was obligated to do under the sale.  (*See  id*. at p. 8).  Pacific denied the allegations and instituted a cross claim against Oakridge for fraud in the inducement and breach of contract. (*See* Doc. No. 54, filed on June 5, 2006).

Defendant Oakridge at Winegard, Inc. and its principal Mahammad Qureshi operated a gas station and convenience store at the premises in question from 1996  until November of 2005.  (*See, e.g.,* Doc. No. 3-1, 3-2).  It is undisputed that throughout this time period,

Oakridge and BP were parties to an exclusive fuel supply agreement to sell BP brand fuel.[1] (*See, e.g.,* Doc. No. 2-2, 2-3, 2-4).  A rider to the fuel supply agreement provided that BP had the right of first refusal if Oakridge received an offer to purchase the premises at any time while the fuel supply agreement was in effect.  (Doc. No. 2-4, p. 3).

By 2003, Oakridge had determined the station was not very profitable and hence sought to sell the premises and concentrate on other business ventures.  (*See, e.g.,* Doc. No. 56, Deposition of Mahammad Qureshi, at pp. 68, 70).  However, Oakridge was unable to sell the premises for some time and began to lower its asking price.  (Doc. No. 41-1 at ¶ 14).  In November of 2005, Pacific Energy, Inc. and its principal, Arooj Ahmed, (collectively "Pacific"), contracted with Oakridge to purchase the premises in question.  (*See, e.g.,* Doc. No. 41-1 at ¶ 14).  Oakridge and Pacific discussed the exclusive fuel supply agreement as Pacific was interested in selling Citgo fuel at the gas station instead of BP fuel.  Mr. Qureshi stated to Mr. Ahmed that it would cost approximately $100,000.00 to institute an early termination of the fuel supply agreement.  (*See, e.g.,* Doc. No. 56, Deposition of Mahammad Qureshi, at pp. 96-98).  This was the amount that might have to be paid back to BP and represented the amount of capital outlay BP had provided initially to construct the station.  Accordingly, Oakridge reduced its purchase price by that amount in order to facilitate the sale, and Pacific began operating a Citgo fuel service station on the premises in question.  (*See, e.g.*, Doc. No. 56, Deposition of Arooj Ahmed, at pp. 28-31).  When BP learned of the sale and subsequent switch to Citgo fuel around March of 2005, it removed any remaining

---

[1] At prior times not material to the instant lawsuit, the parties agree that the Oakridge station sold "Amoco" brand fuel prior to BP's merger with Amoco.

BP trademarks and trade identities from the premises. (*See* Doc. No. 3-1 at ¶ 17).

It is undisputed that at no time prior to the instant litigation did Oakridge forward to BP a copy of the contract with Pacific or orally notify BP of the pending sale. (*See, e.g.,* Doc. No. 41-1 at ¶ 14). Thus, BP never exercised a right to purchase the property pursuant to the contractual right of first refusal.

On April 11, 2006, BP initiated the instant lawsuit and applied to the Court for a preliminary injunction, seeking to void the sale and suspend the operations of the premises in question pending compliance with BP's right of first refusal. (*See, e.g.,* Doc. No. 2, filed on April 11, 2006). On June 26, 2006, the Court denied the motion for preliminary injunctive relief. (*See* Doc. No. 67, filed on June 26, 2006). On the same day, Defendant Pacific moved to refer the case to mediation, which the United States Magistrate Judge granted on July 5, 2006. (*See, e.g.,* Doc. No. 70). On July 25, 2006, the mediator reported that the parties had reached an impasse. (*See* Doc. No. 78, filed on July 25, 2006). On the same day, BP placed $200,000.00 in escrow with Attorney Jerome Mitchell, of the law firm Riggio & Mitchell, P.A., in furtherance of the exercise of its right of first refusal to buy the service station in question. (*See, e.g.,* Doc. No. 123, p. 5). The parties engaged in subsequent settlement discussions on July 27 and July 28, 2006, at which time BP and Pacific contend that the parties reached an enforceable settlement agreement.

On August 14, 2006, BP and Pacific Energy filed Notices of Settlement with the Court, stating that the parties had verbally agreed to the terms of a settlement agreement during a telephone conference on July 28, 2006. (*See* Doc. No. 83 & 84, filed on August 14, 2006). On August 15, 2006, BP filed a motion to enforce compliance with the alleged

settlement agreement.  (*See* Doc. No. 85, filed on August 15, 2006).  Pacific Energy also filed a motion to enforce compliance on August 21, 2006.  (*See* Doc. No. 89, filed on August 21, 2006).  Oakridge filed its response in opposition on August 24, 2006, arguing that Oakridge never gave its attorney, Lee Schillinger, authorization to enter into an enforceable settlement agreement, and that there was never a completed agreement for the Court to enforce.  (*See* Doc. No. 94, filed on August 24, 2006).

The United States Magistrate Judge conducted an evidentiary hearing on the motions to enforce  the settlement agreement on November 2, 2006.  (*See* Doc. No. 130).  At the hearing, the Magistrate Judge heard testimony from, *inter alia*, Mr. Schillinger, Mark Blumstein, the counsel for BP, and Kathryn Weston, counsel for Pacific.  (*See id.*).  On October 20, 2006, the Magistrate Judge issued his Report and Recommendation that the motions to enforce the settlement agreement be granted.  (*See* Doc. No. 123, filed on October 20, 2006).  In such Report and Recommendation, the Magistrate Judge found that Mahammad Qureshi gave Mr. Schillinger clear authority to settle the case and that on July 28, 2006, the parties reached an enforceable settlement agreement to all essential terms without reservation.  (*See  id.*).  According to the Magistrate Judge's Report and Recommendation, the best way to effectuate the terms of the oral settlement agreement would be to enter judgment in favor of BP and against the Oakridge defendants beginning August 27, 2006, for $263,616.95, with a per diem interest amount thereafter accruing in the amount of $65.00 per day, to allow Pacific Energy to remain in possession of the property, and to dismiss with prejudice all pending claims in the litigation without awarding fees or costs.  (*See id.* at p. 13).

BP and Pacific do not object to the Report and Recommendation. Oakridge, however, timely objected to the Magistrate Judge's findings on numerous grounds. First, Oakridge argues that the Magistrate Judge failed to give proper force to the filing of an amended complaint by BP after BP filed its motion to enforce the settlement agreement, which Oakridge argues amounts to a waiver or estops BP from prevailing on its motion to enforce. Secondly, Oakridge argues that the Magistrate Judge erred in interpreting the evidence and in finding that BP and Pacific carried the burden of demonstrating that Mr. Schillinger had the authority to settle and that there was a meeting of the minds. Oakridge further argues that there was a mistake as to the facts by at least one party and that the other parties attempted to take advantage of that mistake. Finally, Oakridge argues that the Magistrate Judge committed error by imposing settlement conditions that are wholly inconsistent with the alleged agreement. (*See* Doc. No. 131 at pp. 12-13).

## Standard of Review

The applicable district court standard of review for a magistrate's report and recommendation depends upon whether objections were made to that report. Where, as here, objections are made to a report and recommendation of a magistrate judge, the district court reviews the case *de novo*.

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b). In addition, a district court may adopt the findings made by a magistrate judge regarding the credibility of witnesses without conducting a new hearing

before making a final determination.  However, a district court may not reject a magistrate judge's findings regarding the credibility of testifying witnesses without holding a new hearing at which the court can observe the demeanor of the witnesses.  *See, e.g.,* 28 U.S.C. § 636(b); *Amlong & Amlong, P.A. v. Denny's Inc.*, 457 F.3d 1180, 1195-96 (11th Cir. 2006).

Federal district courts have the inherent power to summarily enforce settlement agreements entered into by party litigants in a pending case.  "[A] district court has jurisdiction to enforce a settlement agreement, at least when one party refuses to abide by the agreement prior to dismissal of the action."  *Kent v. Baker*, 815 F.2d 1395, 1400 (11th Cir. 1987).  Oral settlement agreements are enforceable under both federal and Florida law. *See, e.g., Skirtich v. Thornton*, No. 3:99-cv-742-J-25HTS, 2003 WL 24845555, at *2 (M.D. Fla. Mar. 28, 2003).  The Court should look to Florida law to determine whether the parties reached an enforceable settlement agreement.  *See Londono v. City of Gainesville*, 768 F.2d 1223, 1227 (11th Cir.1985).

In Florida, settlement agreements are favored as an efficient way to settle disputes and as a means to conserve judicial resources.  Courts will enforce them when it is possible to do so.  *See Long Term Mgmt., Inc. v. Univ. Nursing Ctr., Inc.*, 704 So.2d 669, 673 (Fla. 1st DCA 1997).  Settlement agreements in Florida are interpreted and governed by the law of contracts.  *Williams v. Ingram*, 605 So.2d 890 (Fla. 1st DCA 1992).  The party seeking to enforce a settlement agreement bears the burden of showing the opposing party assented to the terms of the agreement.  *Carroll v. Carroll*, 532 So.2d 1109 (Fla. 4th DCA 1988), rev. denied, 542 So.2d 1332 (Fla. 1989).

To compel enforcement of a settlement agreement, its terms must be sufficiently

specific and mutually agreed upon as to every essential element.  *See, e.g., Don L. Tullis and Assoc., Inc. v. Benge*, 473 So.2d 1384 (Fla. 1st DCA 1985).  Uncertainty as to nonessential terms or small items will not preclude the enforcement of a settlement agreement.  "[T]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs – not on the parties having meant the same thing but on their having said the same thing."  *Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*, 302 So.2d 404, 407 (Fla.1974) (quoting *Gendzier v. Bielecki*, 97 So.2d 604, 608 (Fla.1957)).

A trial court's finding that there was a meeting of the minds between the parties must be supported by competent substantial evidence.  *See, e.g., Long Term Mgmt,* 704 So. 2d at 673. When that evidence exists, the court will enforce the agreement between the parties. *See, e.g., Spiegel v. H. Allen Holmes, Inc.*, 834 So.2d 295, 297 (Fla. 4th DCA 2002).

### Analysis

For the reasons that follow, the Court finds that the United States Magistrate Judge did not err in finding that there was a meeting of the minds on July 28, 2006, and that the parties entered into an enforceable settlement agreement.  Hence, the Court will adopt the Report and Recommendation of the Magistrate Judge and overrule Oakridge's objections.[2]

### A.  Waiver and Estoppel

Oakridge argues that the filing of an Amended Complaint by BP subsequent to its motion to enforce the settlement agreement amounts to a waiver of the relief sought in its

---

[2]     BP's contention that Oakridge's Objection to the Report and Recommendation violates the page limit requirements of the Local Rules of the Middle District of Florida is incorrect.  *See* Local Rule 3.01(a).

motion to enforce or estops BP from prevailing on its motion to enforce.  This argument is not well taken.

BP filed its motion to enforce on August 15, 2006.  (*See* Doc. No. 85).  On September 18, 2006, BP filed an unopposed motion to extend the time limit for it to file an Amended Complaint until October 16, 2001, citing as grounds for such motion the pending motion to enforce.  (*See* Doc. No. 106).  On September 26, 2006, during the evidentiary hearing on the motion to enforce in front of the Magistrate Judge, BP orally moved for another enlargement of time to file an Amended Complaint, but the Magistrate Judge advised the parties to seek further relief after he issued his Report and Recommendation on the motion to enforce.  (*See* Doc. No. 130, p. 180).  On October 16, 2006, before the Magistrate Judge issued his Report and Recommendation, BP filed an unopposed motion for leave to file its Amended Complaint, which asserted new claims against Oakridge.  (*See* Doc. No. 121).  The Court granted the motion on October 17, 2006.  (*See* Doc. No. 122).  After the Magistrate Judge issued his Report and Recommendation, BP did not move to withdraw its Amended Complaint.

None of BP's actions subsequent to the filing of its motion to enforce amounts to either a waiver of BP's request for relief or estops BP from prevailing on its motion to enforce.  To demonstrate waiver, it must be shown that a party intentionally or voluntarily reqlinuished a known right, or engaged in conduct which warrants an inference of the relinquishment of a known right.  *See, e.g., Singer v. Singer,* 442 So. 2d 1020, 1022 (Fla. 3d DCA 1983).  Oakridge does not argue that BP expressly waived its motion to enforce the settlement agreement, and express waiver is not shown in the evidence.  If BP waived its

right to relief in the instant case, such waiver must be inferred by its conduct.  However, BP's conduct in the case at bar clearly does not demonstrate that it sought to relinquish a known right.  By filing its Amended Complaint, BP sought to comply with a Court Order mandating the filing of an Amended Complaint by October 16, 2006.  BP sought to again extend such deadline but was advised by the Magistrate Judge to seek relief after the filing of the Report and Recommendation.  Generally, compliance with a court order does not amount to waiver or estoppel.  *See, e.g., Schreiber v. Schreiber*, 217 So. 2d 301, 303 (Fla. 1968) (not waiver or estoppel where appellant sought an appeal of alimony decision while accepting alimony payments made pursuant to the order the party sought to appeal).

Likewise, BP's actions in the instant case do not estop it from prevailing on its motion to enforce.  Estoppel is established by demonstrating each of three elements:  (1) a representation as to a material fact that is contrary to a later-asserted position; (2) reliance on that representation; and (3) a change in position detrimental to the party claiming estoppel caused by the representation and reliance thereon.  *See, e.g.,Tri-State Systems, Inc. v. Dep't of Transportation*, 500 So. 2d 212, 215-16 (Fla. 1st DCA 1986).  Here, Oakridge's Objection fails to assert how any of BP's acts or omissions establish any of the three elements of estoppel.  Nor does Oakridge assert that it has suffered a detrimental change in position due to BP's actions.  Thus, the Court finds no basis for waiver or estoppel in the instant case.

## B.  Authority to Settle

As clearly reflected by the evidence in the case at bar, Mahammad Qureshi had given Attorney Schillinger clear and unequivocal authority to settle the case on behalf of Defendants Oakridge and Mr. Qureshi.  Thus, the Court finds that the Magistrate Judge did

not err in finding that Mr. Schillinger had the authority to settle the case during the parties'
telephonic meeting on July 28, 2006.

In Florida, the party seeking to enforce the settlement agreement must establish that
counsel for the opposing party was given the clear and unequivocal authority to settle the
case by his or her client.  *See, e.g., Spiegel*, 834 So. 2d at 297 (citing *Jorgensen v. Grand
Union Co.*, 490 So.2d 214 (Fla. 4th DCA 1986)).  "An unauthorized compromise, executed
by an attorney, unless subsequently ratified by his client, is of no effect and may be
repudiated or ignored and treated as a nullity by the client."  *Vantage Broadcasting Co. v.
WINT Radio, Inc.*, 476 So. 2d 796, 798 (Fla. 1st DCA 1985).  In *Murchison v. Grand
Cypress Hotel Corporation*,[3] the Circuit Court considered the following facts in deciding
whether a client had given his attorney clear authority to settle the case:  1) whether the
client knew his lawyer was in the process of negotiating a settlement; 2) whether and how
many times the client met or spoke with his attorney while settlement negotiations were
ongoing; 3) whether the client was present in the courtroom when the settlement was
announced in open court; 4) whether the client immediately objected to the settlement; and
5) whether the client was an educated man who could understand the terms of the settlement
agreement.  *See Murchison*, 13 F.3d at 1485-86.

In the instant case, Mr. Qureshi testified that he has worked in his current line of
business for 17 years and is the owner of a "couple hundred gas stations."  He also testified
that he had participated in seven or eight earlier lawsuits and was represented in such
lawsuits by several different litigation attorneys.  Further, Mr. Qureshi indicated that he was

---

[3]     *Murchison*, 13 F.3d 1483 (11th Cir. 1994).

motivated to settle the case at bar because Pacific had offered to buy several other properties owned by Mr. Qureshi. (*See, e.g.,* Doc. No. 130 at pp. 138-39, 146-48). Based on this testimony, the Court finds that the Magistrate Judge did not err in finding that Mr. Qureshi was a sophisticated business owner who was motivated to settle the instant suit.

Furthermore, the Magistrate Judge did not err in finding that Mr. Qureshi's testimony that he did not give Mr. Schillinger authority to settle the case was not credible. Throughout the evidentiary hearing, Mr. Qureshi's testimony was contradictory and evasive. For instance, Mr. Qureshi testified at the hearing that he authorized Mr. Schillinger to settle the case in early July. In fact, Mr. Qureshi stated that Mr. Schillinger set up a round of mediation in early July after being told to settle the case by Mr. Qureshi. (Doc. No. 130, pp. 146-47). After the parties had reached an impasse in mediation, Mr. Qureshi testified that he again told Mr. Schillinger to resume settlement negotiations and to settle the case. (*Id.*) However, Mr. Qureshi also testified at the same hearing that he never authorized Mr. Schillinger to completely settle the matter, but that he did give his attorney the general direction to get the case settled. (*See, e.g., id.* at p. 138). In addition, Mr. Qureshi testified that he does not read letters but leaves the task of reading letters to his assistants. (*See, e.g.,* Doc. No. 123, p. 10). Later he insisted that he did not give his attorney authority to settle the case because he first wanted to reduce to writing and read the settlement agreement. (*See, e.g.,* Doc. No. 130, pp. 149-53, 159). Finally, as the Magistrate Judge correctly noted, Mr. Qureshi testified at the September 26, 2006 hearing about his conversations with Mr. Schillinger in which he specifically recalled not giving his attorney the authority to settle. However, Mr. Qureshi specifically stated that he did not remember those conversations when

he was deposed about them by BP two weeks prior to the hearing on September 14, 2006. (*See* Doc. No. 130, p. 146; Doc. No. 123, p. 10).

Applying he factors present in *Murchison,* there is strong indication that Mr. Schillinger had the authority to settle the case.  Mr. Qureshi knew of the ongoing settlement negotiations between counsel and by his own admission was the impetus of such negotiations.  Furthermore, Mr. Qureshi is a sophisticated owner of hundreds of service stations who clearly was capable of understanding the settlement agreement.  Finally, although, unlike *Murchison*, the alleged settlement agreement was not announced in open court, Mr. Qureshi and his attorneys stood silent for almost two weeks before objecting to the agreement on August 11, 2006 and attempting to renegotiate it.[4]  (*See, e.g.,* Doc. No. 130, pp. 121-22; Doc. No. 123, p. 8).  Thus, the Court finds that the Magistrate Judge did not err in finding that Mr. Schillinger was given clear and unequivocal authority to settle the case.

## C.  Meeting of the Minds

Competent substantial evidence exists which demonstrates that there was a meeting of the minds and the parties entered into an enforceable settlement agreement on July 28, 2006.  Thus, the Court finds the Magistrate Judge did not err in finding that competent,

---

[4]     The record demonstrates that after the parties reached a verbal agreement on July 28, 2006, Mr. Schillinger informed his client of the meeting and later forwarded a copy of a proposed written settlement agreement to another one of Oakridge's attorney's, Steve Serrano.  (*See, e.g.,* Doc. No. 130, p. 121).  Although Mr. Schillinger attempts to explain Oakridge's silence during this two week period by referencing his busy trial schedule, this reason fails to explain why Mr. Qureshi, Mr. Schillinger, and Mr. Serrano all failed to object to the purported settlement agreement at an earlier date.

substantial evidence exists which demonstrates that a settlement was reached in the instant case.

Based on the testimony presented at the evidentiary hearing and the evidence submitted by the parties, the following facts regarding the settlement discussions are undisputed.  Pursuant to Mr. Qureshi's instructions to resume settlement negotiations, Mr. Schillinger sent an email to counsel for BP and Pacific on July 27, 2006 asking to renew the discussions which began during mediation regarding settlement.  (*See, e.g.,* Doc. No. 123, p. 6; Plaintiff's Ex. 1).  On July 28, 2006, Mr. Schillinger telephoned Mr. Blumstein, counsel for BP, and offered a settlement proposal whereby Oakridge would pay to BP $263,616.95, the amount allegedly due to BP for the unamortized advance of funds under the Dealer Supply Agreement.  (*See, e.g.,* Doc. No. 123, p. 6; Doc. No. 130, pp. 111-12).  Mr. Blumstein testified that Mr. Schillinger confirmed that the money would be coming from Oakridge, that BP would retain the $200,000 BP had placed in escrow earlier in July, and that Pacific would retain ownership of the premises in question pursuant to the earlier sale.  (*See, e.g.,* Doc. No. 123, p. 6; Doc. No. 86; Doc. No. 130, p. 54).  Mr. Blumstein then called Ms. Weston, counsel for Pacific Energy, to inform her of the settlement offer.  (*See, e.g.,* Doc. No. 123, p. 6; Doc. No. 90).

In the late afternoon of July 28, 2006, counsel for all three parties conducted a telephonic meeting in which BP and Pacific contend that the parties verbally agreed to a settlement reflecting Mr. Schillinger's terms.  (*See, e.g.,* Doc. No. 130, pp. 74-75).  At 5:34 p.m., Mr. Blumstein sent an email to Mr. Schillinger and Ms. Weston which states in pertinent part:

This letter shall memorialize the material terms of the settlement reached today between the parties in the subject matter. They are as follows:

1.  Within thirty (30) days of the date of this letter, Oakridge at Winegard, Inc. ("Oakridge") and/or Mahammad Qureshi ("Qureshi") shall [sic] a cashier's check for Two Hundred Sixty Three Thousand Six Hundred Sixteen and 95/100 Dollars  ($263,616.95) ("Settlement Amount") payable to BP products North America Inc. ("BP").

2.  The monies currently held in escrow with Riggio & Mitchell, PA in the amount of Two Hundred Thousand and 00/100 Dollars ($200,000) ("Escrow Funds") shall be returned to BP via the undersigned.

3.  Oakridge, Qureshi, Pacific Energy, Inc. ("Pacific") and BP (collectively the "Parties") shall be responsible for their respective fees and costs.

4.  The Parties shall enter into a Settlement Agreement and Release to be prepared by BP. The Parties shall release each other from any and all claims pending in the subject matter, including those pertaining to 601 West Oakridge Road, Orange County, FL - the assets, improvements and/or business thereon.

5.  The Parties shall dismiss with prejudice all pending claims before the court in the subject matter following delivery of the Settlement Amount and return of the Escrow Funds to the undersigned, as well as the execution of the Settlement Agreement and Release.

6.  The Parties shall execute a Stipulation of Dismissal with Prejudice of the subject matter following execution of the Settlement Agreement and Release and payment and delivery of the Settlement Amount and Escrow Funds to the undersigned.

Thank you all for your cooperation and prompt resolution of this matter. I will circulate the Settlement Agreement and Release next week and notify the court that the parties have settled this dispute.

(*See* Doc. No. 123, p. 7-8; Plaintiff's Ex. 2).  There is no dispute that counsel for Oakridge

and Pacific received and read the email from Mr. Blumstein.

Later that day, Ms. Weston electronically replied to the correspondence at 10:27

p.m., stating to Mr. Blumstein and Mr. Schillinger that "The letter reflects my understanding

of our agreement.  It is implied but not explicitly stated in the agreement that Pacific Energy will retain title to the station, which is, I understand, part of our agreement." (*E.g.,* Doc. No. 123, p. 8; Plaintiff's Ex. 3).  At 10:58 p.m., Mr. Schillinger electronically replied that "The agreement must reference the termination of all obligations under the supply agreement and resignage agreement, acknowledging that all loans have been paid in full, and please return the original notes marked paid in full." (*E.g.,* Doc. No. 123, p. 8; Plaintiff's Ex. 4).  Mr. Schillinger sent no further correspondence regarding Mr. Blumstein's memorialization of the parties' conversation.

On or about July 28, 2006, Mr. Blumstein notified the escrow agent, Jerome Mitchell, that the instant case was settled and that Mr. Mitchell should return BP's escrow deposit to BP pursuant to the settlement agreement.  (*See, e.g.,* Doc. No. 96, p. 3).  Mr. Mitchell then called Mr. Schillinger and asked him to confirm that the parties had settled the case.  Mr. Schillinger replied to Mr. Mitchell that the case had been settled.  (*See, e.g., id.*; Doc. No. 130, pp. 116-17).  Mr. Schillinger added, however, that the escrow amount should not be returned until a bilateral, signed agreement was presented to the escrow agent.  (*See, e.g.,* Doc. No. 96, p. 3; Doc. No. 130, pp. 116-17).

Mr. Schillinger testified that he was generally unavailable for consultation regarding the settlement from July 28 until August 10, as he was participating in an unrelated trial in Florida state court.  Between August 4, 2006 and August 10, 2006, Ms. Weston and Mr. Blumstein circulated several drafts among the three parties.  On August 10, 2006, Mr. Blumstein emailed a "redlined" version of the settlement agreement to the parties and suggested that counsel hold a conference in the afternoon "with an aim to go final,

commence execution and bring this matter to a close." (*See* Defense's Ex. 7; Doc. No. 123, p. 8). It is undisputed that Mr. Schillinger and Oakridge raised no objections to the settlement agreement, other than Schillinger's brief email on July 28, until August 11, 2006, when Mr. Schillinger in a letter to the parties stated for the first time that Oakridge would not be able to pay the settlement amount within thirty days, and that the agreement should reflect that Pacific should reimburse Oakridge for up to $100,000.00 for the cancellation of the Fuel Supply Agreement. (*See*, *e.g.,* Plaintiff's Ex. 5; Doc. No. 123, p. 9). After the parties were unable to agree regarding these terms, BP and Pacific filed motions to enforce the settlement agreement. (*See* Doc. No. 85, 89).

Mr. Schillinger does not dispute that he generally agreed to the settlement terms during the late afternoon conference call on July 28, 2006, but states that he considered these negotiations to be informal, initial negotiations, and that he thought it was understood that the agreement would be reduced to writing and subject to Mr. Qureshi's review and approval of a written document. (*See, e.g.,* Doc. No. 130, pp. 101-03). Mr. Schillinger also testified that he believed that the proposed settlement would not release Pacific from its alleged obligation to indemnify Oakridge for up to $100,000.00 of the early termination fee and that the indemnity provision would still have to be litigated between Oakridge and Pacific. (*See id.*). Mr. Schillinger further admitted during the evidentiary hearing that he did not qualify the settlement terms during the three-way conference call or in his electronic response to Mr. Blumstein's email on July 28 by stating the settlement was "subject to his client's approval." (*See, e.g.,* Doc. No. 123, p. 12; Doc. No. 130, p. 116). Mr. Schillinger did state, however, that he made such statement on another occasion or occasions and specifically remembers

-17-

saying this on August 11, 2006.  (*See* Doc. No. 130, p. 116).

Oakridge raises two specific arguments to support its contention that the United States Magistrate Judge erroneously found that there was a meeting of the minds in the instant case.  First, Oakridge states that Oakridge and Pacific were engaged in "a multitude of negotiations" regarding other properties, and that the parties never determined the exact scope of the releases sought by the settlement agreement with regard to the ongoing negotiations regarding such properties.  Thus, it argues, there could be no meeting of the minds, because a "sufficiently broad release between Oakridge and Pacific could affect myriad issues not contained within this case."  (*See* Doc. No. 131, p. 21).  This argument is not well taken.  As the Magistrate Judge noted, while the exact language of the releases was not crafted during the July 28 conference call, the evidence clearly establishes that the parties all agreed to release all of their claims against one another in the instant case and did not address collateral matters such as Oakridge's and Pacific's business dealings.  Hence, while it is undisputed that the parties could have discussed and crafted an agreement addressing such extraneous matters, it is likewise clear that they did not.  On this matter, the testimony of Ms. Weston is instructive:

> And, so, in [the late afternoon] discussion, Mr. Schillinger said, yeah, we're gonna pay the 263,000.  And I wrote down the number.  I don't recall [the exact number] at this time, but I did write it down.  And then it was the same number that showed up in [Mr. Blumstein's] letter.  He said, we're gonna pay that number.  And I very distinctly remember saying, okay, and are all of the other claims against all of the parties and among the parties going to be dismissed?  And Mr. Schillinger said, Yes.  And [Mr. Blumstein] said that's my understanding.  And the second question I said was, and everybody is gonna sign a general release with regards to the claims in this suit?  And both [Mr. Schillinger and Mr. Blumstein] said, yes.

(Doc. No. 130, pp. 74-75).  Mr. Blumstein's testimony was consistent with that of Ms.

Weston, and Ms. Weston's testimony is not directly contested by Oakridge's objection to the Report and Recommendation.  (*See id*. at pp. 54-56; Doc. No. 131; pp. 21-22).

"[T]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs – not on the parties having meant the same thing but on their having said the same thing."  *Blackhawk Heating,* 302 So.2d at 407.  While Mr. Schillinger may have privately believed that the indemnity provisions were yet to be litigated between Oakridge and Pacific, he clearly, based on unequivocal authority from his client, overtly agreed to a complete settlement in the case at bar.  As *Murchison* makes clear, a litigant cannot permissibly attack a settlement simply because the relief he apparently wanted and the relief to which he agreed were not the same. *Murchison*, 13 F.3d at 1487.

Next, Oakridge argues that any alleged meeting of the minds should be held unenforceable under Florida law.  Oakridge argues that because counsel for BP and Pacific knew or had reason to know that Oakridge inadvertently omitted discussion of the $100,000.00 reimbursement amount allegedly owed by Pacific to Oakridge for early termination of the fuel supply agreement, any settlement agreement must be held unenforceable under the theory of unilateral mistake.  Such argument fails for at least two reasons.  First, the evidence does not show and Oakridge fails to demonstrate how, as it contends, BP and Pacific knew or should have known that the $100,000.00 reimbursement amount had been inadvertently omitted, especially when the evidence clearly demonstrates that the parties all agreed to release all claims against each other arising out of the instant litigation during the July 28 conference call.  Secondly, and more importantly, even if

-19-

unilateral mistake were present in this case, such mistake on the part of Mr. Schillinger, a sophisticated attorney who has practiced law for approximately 35 years, would be deemed an inexcusable lack of due care.  *See, e.g., BMW of North America, Inc. v. Krathen*, 471 So. 2d 585, 588 (Fla. 4th DCA 1985) (omission of an important term of a settlement agreement by an attorney in a non-complex transaction with few terms constituted inexcusable lack of due care).  In Florida, a mistake resulting from an inexcusable lack of due care cannot be used to set aside a contract on the basis of unilateral mistake.  *See, e.g., id.*; *Maryland Cas. Co. v. Krasnek*, 174 So. 2d 541 (Fla. 1965).

Thus, the Court finds that the Magistrate Judge did not err in finding that competent, substantial evidence exists which demonstrates that the parties reached a settlement in the instant case.

### D.  Terms of the Settlement

Finally, the Court finds the United States Magistrate Judge did not err in his recommended construction of the terms of the settlement agreement.  On July 28, 2006, the parties agreed to settle the case upon the conditions that 1) Oakridge pay to BP $263,616.95 within thirty (30) days of July 28; 2) that BP be permitted to keep its escrow deposit; 3) that Pacific be allowed to remain in possession of the property; and 4) that the parties dismiss with prejudice all pending claims in the litigation.  For these reasons, the best way to effectuate the terms of the oral settlement is to enter judgment in favor of BP and against Mr. Qureshi and Oakridge beginning August 27, 2006 for $263,616.95 due, plus a per diem amount of $65.00 for all days in the calendar year 2006, and $79.45 for all days in the

calendar year 2007,[5] to allow Pacific Energy to remain in possession of the property, and to dismiss with prejudice all pending claims in the litigation, awarding no fees or costs.

## Conclusion

Based on the foregoing, the Court **ADOPTS** the Report and Recommendation of the United States Magistrate Judge, (Doc. No. 123), and **OVERRULES** the Objections to Magistrate's Report and Recommendation and Incorporated Memorandum of Law, filed by Defendants Oakridge at Winegard, Inc. and Mahammad Qureshi on November 3, 2006. (Doc. No. 131).  The Request for Oral Argument, filed Defendants on November 3, 2006, (Doc. No. 132), is also **DENIED**.

The Clerk shall enter judgment in favor of Plaintiff BP Products North America, Inc. and against Defendants Oakridge and Qureshi for $263,616.95,  plus  $8428.35 in interest from August 28, 2004 until January 3, 2007, for a total judgment of $272,045.30, for which sum execution may issue.  After entry of this final judgment, postjudgment interest shall accrue as allowed by law.  Furthermore, the Clerk shall dismiss all pending motions as moot, dismiss with prejudice all pending claims, and close this case.

**DONE** and **ORDERED** in Chambers in Orlando, Florida this _3rd_ day of January, 2007.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[5] *See* § 55.03, Florida Statutes. Under this statute, interest accrues at 9% per annum during 2006 and at 11% per annum during 2007.

-21-

Copies furnished to:

Counsel of Record

Clerk of Court